UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NANCY A. COMPTON,

    Plaintiff,

v.

DUPAGE COUNTY HEALTH DEPARTMENT,

    Defendant.

No. 17 CV 7575

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nancy Compton provided home-based health services to a client through a program that the State of Illinois funded and the DuPage County Health Department administered. After the state stopped funding the program, the county ended its participation in it. Compton continued working, but stopped receiving paychecks. She alleges that the county violated the Fair Labor Standards Act and the Illinois Minimum Wage Law when the state stopped paying her. She also brings a breach-of-contract claim. Compton moves for partial summary judgment on the issue that she was an "employee" of DuPage County under the FLSA and IMLW. The county moves for summary judgment on all counts. For the reasons discussed below, the county's motion is granted, and Compton's motion is denied.

**I.    Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, "[t]he ordinary standards for summary judgment remain unchanged." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). I construe all facts and inferences "in favor of the party against whom the motion under consideration is made." *Id.*

Cross-motions should be considered together; summary judgment is appropriate only when the evidence "as a whole" shows there is no genuine dispute as to any material fact. *See Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011); *see also Bloodworth v. Vill. of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012) ("Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute."). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.   Background

Defendant DuPage County Health Department helped administer a state-funded program that provided home-based support services for adults with severe mental illness. [62] ¶¶ 1–2, 57; [66] ¶ 5.[1] Steve Gaydos, a county health department

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from the county's response to Compton's Local Rule 56.1 statement, [62], and Compton's response to the county's Local Rule 56.1 statement, [66], where both the asserted

2

case manager, oversaw the program for three years. [62] ¶¶ 3–4, 22; [66] ¶¶ 17–19. Gaydos evaluated each home-based client's needs, wrote up a service plan for the individual, and, if appropriate, assigned a "respite worker" to provide in-home services to that client. [62] ¶¶ 18, 19; [66] ¶¶ 23–24, 33.[2] Once a month, the respite worker reported how many hours he or she had worked to Gaydos, who entered those hours into a state website so the state could pay the worker. [66] ¶¶ 6–7, 25–26. If the client reported that the assigned provider wasn't working out, Gaydos assigned the client a different respite worker. [62] ¶¶ 20–21. Gaydos also reported what services each client received to the state and submitted receipts from the client to the state for reimbursement. [62] ¶ 23; [66] ¶¶ 5, 32.

Gaydos learned that plaintiff Nancy Compton was seeking work. [62] ¶ 7. He met with Compton and explained that the state was hiring respite workers, and helped her fill out an online application. [62] ¶ 7; [66] ¶ 20.[3] The state accepted

---

fact and the opposing party's response are set forth in one document. I disregard any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record). Only facts that are properly controverted will be considered disputed.

[2] The county objects to Compton's assertion that the written plan for each client included the role of the respite worker. The county asserts that Compton's citation does not support the proposition. [62] ¶ 19. Gaydos testified that, generally, the written plan addressed what a respite worker should do regarding that client, [52-3] 48:15–22, so the record supports the assertion and the fact is not disputed.

[3] Compton disputes that Gaydos helped her apply for the job. [66] ¶¶ 20–21. The record supports the county's assertion. Gaydos testified that he "help[ed]" Compton "with the site" "where she would have to apply." [55-3] 17:8–9. Compton attempts to controvert it by citing to similar, but not directly related, testimony, in which Compton said that she applied for the job by giving Gaydos her name, address, and social-security number, but didn't know if she had ever submitted any written application or signed an employment agreement. [55-4]

3

Compton into the program. [66] ¶ 21.[4] After Compton passed a state-run background check, Gaydos matched her with a home-based client. [62] ¶ 14; [66] ¶¶ 21, 46. Gaydos considered Compton a state employee because the state had conducted the background check and was paying her. [66] ¶ 28. The state collected all of the forms related to Compton's employment. [66] ¶ 29.

Compton did not receive any training or review any materials before beginning work as a respite worker. [66] ¶ 37. No one from the county told Compton what services she should provide to her client. [66] ¶ 49.[5] Compton was told that, if she had any questions or issues, she should report them to Gaydos. [62] ¶ 5.

Compton worked 10 to 20 hours per week. [66] ¶ 38. She determined what services to administer, how many hours to work, and when to work by discussing the client's needs and schedule with the client and his mother. [66] ¶¶ 39–42. Compton never discussed her schedule with Gaydos or anyone from the state. [66] ¶ 43. If she

---

13:14–14:2. Compton's testimony does not controvert the county's assertion that Gaydos helped her apply for the respite-worker job.

[4] Compton disputes that the state had to accept her into the program, by citing to her own testimony that it was Gaydos who hired her. [66] ¶ 21. The record supports the county's fact: Gaydos testified that, after Compton submitted her application to the state, "she was either accepted or not accepted." [55-3] 17:7–13. Compton's perspective of Gaydos's role does not controvert Gaydos's competent testimony that the state accepted the workers into the program.

[5] Compton disputes that the county did not train her for the respite-worker program or tell her what services to provide. [66] ¶¶ 37, 49. To controvert both facts, she cites a section of her deposition in which she testified that the county had trained and instructed her in client-based health services when she had previously worked for the county in group homes. [55-4] 57:11–58:16, 62:22–63:7. The record supports the county's assertion that she did not receive training or instruction specifically for the respite-worker program. When asked if she received "any training for the respite program," Compton responded, "No." [55-4] 15:4–6. Likewise, when asked if anyone at the health department told her "what tasks" to "perform," or "how to do those tasks" "when [she] began working as a respite worker," Compton said, "No, not really, no." [55-4] 56:14–57:5.

had to miss a day, she notified the client's mother. [66] ¶ 53. Compton bought a number of word-search, reading, and math books for the client, but did not seek reimbursement from the county for those purchases. [66] ¶ 51–52. She chose what books to buy based on conversations with the client's mother. [66] ¶ 51.

Once a month, Compton reported her work hours, mileage, and reimbursement claims to Gaydos, either over the phone or via text. [62] ¶¶ 8–10; [66] ¶¶ 22, 31, 44. Gaydos then entered Compton's hours into a computer system, which transmitted the information to the state for payment. [62] ¶¶ 8, 57; [66] ¶¶ 13, 22, 30. The state paid Compton once a month, on an hourly basis, at a rate determined by the state. [62] ¶¶ 11, 57; [66] ¶¶ 27, 30, 45.[6] Once every few months, Gaydos would meet with Compton and the client. [66] ¶ 46. Gaydos would ask how things were going and collect any receipts from the client for reimbursement from the state. [66] ¶¶ 46–47.

In July 2015, the state stopped funding the program, and the respite workers stopped receiving paychecks. [62] ¶¶ 58, 63; [66] ¶ 8. At some point before December, Compton told Gaydos that she was not being paid. [62] ¶¶ 12, 58. Gaydos told her to contact the state. [62] ¶ 12. Gaydos retired in December, and the county appointed someone new to oversee the program. [62] ¶ 6; [66] ¶ 17. Overall, Gaydos worked with Compton for about two years. [62] ¶ 22.[7]

---

[6] Compton's attempt to dispute the assertion that the state determined her pay rate lacks personal knowledge, *see* [55-4] 14:10–18, 21–22, and the record supports the county's assertion: Gaydos—a county official participating in the program's relationship with the state and therefore with personal knowledge of rate-setting—testified that it was the state who set the pay rate. [55-3] 26:24–27:5.

[7] Compton asserts that Gaydos "oversaw" her work for two years, and the county objects to that assertion. [62] ¶ 22. Whether Gaydos oversaw Compton's work is an inference that is

5

In June 2016, the county ended its involvement in the program. [66] ¶¶ 9, 16.[8] Compton told Sarah Miller, a county community support specialist and her therapist, that she was not being paid. [62] ¶ 34; [66] ¶¶ 54–56. Miller reported Compton's payment problems to Jeffrey Lata, another health department employee. [62] ¶¶ 38, 41, 50; [66] ¶ 4, 57. Lata told Miller that the state had not funded the program for a while, and Compton should contact the state. [62] ¶ 42; [66] ¶ 57. Compton contacted Lata directly, and Lata told her that the home-based program had ended and the county was no longer participating in the program. [62] ¶ 44; [66] ¶ 11.

## III. Analysis

Compton brings claims against DuPage County Health Department under the Fair Labor Standards Act and the Illinois Minimum Wage Law, and also brings a breach-of-contract claim. She moves for partial summary judgment on the ground that she was an employee of DuPage County. In her view, the state and county were her joint employers.

The county argues that Compton was an independent contractor, not an employee (of either DuPage County or the state). Alternatively, it argues that if Compton was an employee of anybody it was the state, not the county. Finally, the

---

not supported by the record evidence. Gaydos testified that he "worked with" Compton for at least two years. [52-3] 24:23–25:11.

[8] Compton disputes this fact, because the program "continued long after July of 2015." [66] ¶ 16. Since the county asserts that the program ended in June 2016, the two assertions are consistent and the fact is not properly controverted. And the record supports the county's assertion. Jeff Lata, a county employee, testified that the county ended all involvement in the program in June 2016. [55-2] 77:18–78:7. In any event, the exact moment the program ended is immaterial to the analysis of whether DuPage County employed Compton while the program was up and running.

county argues that, even if Compton had been an employee of DuPage County, the employment relationship ended when county employees told Compton that the department was no longer participating in the state program.

A.  **The County's Motion to Strike**

The county moves to strike several asserted facts in Compton's Rule 56.1 statement on the ground that they are conclusory statements, not facts. [60] at 4. But motions to strike are generally disfavored. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (motions to strike "potentially serve only to delay"). And motions to strike at the summary-judgment stage are particularly unnecessary, because the court must always review statements of material facts and "eliminate from consideration any argument, conclusions, and assertions" that are unsupported by the record. *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F.Supp.3d 917, 921 (N.D. Ill. 2014). Also, striking whole paragraphs runs the risk of "throw[ing] out a properly supported assertion along with a legal argument or conclusion." *Rivera v. Guevara*, 319 F.Supp.3d 1004, 1018 (N.D. Ill. 2018) (denying motion to strike conclusory statements in Rule 56.1 statement). As noted above, I disregard arguments and legal conclusions in the Rule 56.1 statements, so a motion to strike is unnecessary. The county's motion is denied.

B.  **Compton's Waiver Argument**

Compton contends that the county improperly raised its argument that Compton was an independent contractor—which she categorizes as an affirmative defense—for the first time in summary judgment, so the county waived the argument.

Compton asserts that she did not have notice of the independent-contractor argument and did not conduct discovery on the issue.

Compton does cite any authority for the proposition that asserting independent-contractor status is an affirmative defense that must be raised at the pleading stage, and I do not find that it is. *See, e.g.*, *Talbert v. Am. Risk Ins. Co.*, 405 Fed. App'x 848, 851 (5th Cir. 2010) ("[T]his court has never held that independent contractor status is an affirmative defense to a claim for overtime compensation under the FLSA."). *But see Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1213 (11th Cir. 2010) (referring to "five affirmative defenses, including the defense that [plaintiff] was an independent contractor" in FLSA overtime case). A plaintiff's status as an employee is part of her case-in-chief; it is her burden to prove that the defendant was her employer.

In any event, the purpose of the pleading requirement for an affirmative defense is to "avoid surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to demonstrate why the defense should not prevail." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019) (quoting *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997)). But the rule that a defendant forfeits an affirmative defense not pleaded earlier is "not to be applied rigidly." *Id.* (quoting *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014)). Rather, a defendant forfeits an alleged affirmative defense only if the plaintiff "is harmed by the defendant's delay in asserting it." *Id.* (quoting *Garofalo*, 754 F.3d at 436).

Here, the county moved to dismiss Compton's complaint on the grounds that she was not the county's employee, [14], [20], so it put Compton on notice of its position. Its characterization of Compton as an "independent contractor" is just another way of saying that she was not an employee. The discovery regarding that issue would have been the same. Nor can Compton seriously assert that she wasn't on notice of the argument, as she cited *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987), in her motion for summary judgment. [51] at 7. That case provides the governing factors for courts to determine whether alleged employees are employees or independent contractors under the FLSA. *Lauritzen*, 835 F.2d at 1538. Compton was aware of the argument, so she could not have suffered harm from the county not using the words "independent contractor" in its motion to dismiss. What matters is that the county has consistently asserted that it did not employ Compton, regardless of whether it precisely classified her as an independent contractor or simply not an employee. The county did not waive or forfeit its argument.

### C. The FLSA Claim

Whether the county employed Compton is a question of law. *Karr v. Strong Detective Agency Inc.*, 787 F.2d 1205, 1206–07 (7th Cir. 1986). Generally, courts must construe the terms employee and employer "expansively under the FLSA." *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (quoting *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992)). The statute defines "employee" "in an unhelpful and circular fashion as 'any individual employed by an employer.'" *Berger. Nat'l*

*Collegiate Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016) (quoting 29 U.S.C. § 203(e)(1)). To employ means to "suffer or permit to work." 29 U.S.C. § 203(g).

To determine whether someone qualifies as an employee under the FLSA, courts consider the totality of the circumstances. The ultimate goal is to determine the "economic reality of the working relationship." *Simpkins*, 893 F.3d at 964 (quoting *Vanskike*, 974 F.2d at 808); *Berger*, 843 F.3d at 290. An employee is someone who, "as a matter of economic reality," is "dependent upon the business to which [she] render[s] service." *Simpkins*, 893 F.3d at 965 (quoting *Lauritzen*, 835 F.2d at 1534).

A number of factors have historically informed the analysis. *Lauritzen*, 835 F.2d at 1534–35. Those include the alleged employer's control "as to the manner in which the work is to be performed"; the employee's opportunity for profit or loss depending upon her managerial skill; the employee's investment in equipment or materials required for her task; whether the service rendered requires a special skill; the degree of permanency and duration of the working relationship; and the extent to which the service is an "integral part of the alleged employer's business." *Id.* at 1534–35. No one factor by itself, or the absence of any factor, is "dispositive or controlling." *Id.*

I may disregard the *Lauritzen* factors if they "fail to capture the true nature of the relationship" between DuPage County and Compton. *Berger*, 843 F.3d at 291 (quoting *Vanskike*, 974 F.2d at 809); *Vanskike*, 974 F.2d at 809 (rejecting application of the *Lauritzen* test because it was "not the most helpful guide in the situation presented"). *See generally Hollins v. Regency Corp.*, 867 F.3d 830, 835 (7th Cir. 2017)

(noting that the district court was "rightly skeptical" about the usefulness of a factor-based test to determine whether plaintiff was an employee under FLSA). Put differently, the *Lauritzen* factors "are not the exclusive means by which the ultimate determination can be made." *Simpkins*, 893 F.3d at 964–65.

For a joint-employer relationship to exist, "each alleged employer must exercise control over the working conditions of the employee." *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008); *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, (7th Cir. 2007).

Whether viewed through the joint-employment or independent-contractor lens, the question is essentially the same: whether, under the totality of the circumstances, DuPage County exerted enough control over Compton's working environment such that the county employed her. It did not. The county's control over Compton's work was minimal. Its most significant role was assigning Compton to a client. But after that initial match, Compton worked largely independently, with little oversight or guidance from the county.

For example, the county had no control over her schedule. Compton decided, in consultation with her client and his family, how many hours to work every week. She decided which days she should work, and what time to begin and end. If she had to miss a day, she called the client's family directly, rather than calling into the county. And the county did not dictate how Compton was to do her job. It did not train Compton how to be a respite worker or instruct her on what specific tasks to perform. Rather, she decided what services the client needed in conjunction with his family.

11

The county did not provide her any supplies, or give her guidance on what supplies she should provide. Compton purchased supplies and books for the client on her own.

The infrequency of the communication between Compton and Gaydos is another sign that she was not a county employee. Compton interacted with Gaydos only once a month, when she called him or texted her hours to him. Other than that, Gaydos sat down with Compton and the client only a few times a year to check in. A reasonable factfinder could not find that Gaydos supervised Compton, when she interacted with him only once a month and saw him face-to-face only a few times a year, particularly since their interactions were limited to either reporting hours or surface-level check-ins, rather than substantive oversight, feedback, or instruction.

Finally, while I need not decide whether the state employed Compton for purposes of these motions, the state's role in Compton's work—in comparison to the county's—is telling. Compton applied for the job through a state website. The state kept all records related to her work in the program, and it was the state that conducted a background check before Compton started. The county transmitted all hours and reimbursements to the state for payment. The goal is to ascertain the economic reality of the relationship, and the state paid Compton. That cuts against her argument that the county was her employer in an economic or pecuniary sense. And when Compton stopped receiving payment, multiple county employees told her to contact the state to remedy the situation. Likewise, the "business" to which Compton "rendered service," *Simpkins*, 893 F.3d at 965, was the client himself. Considering the totality of the circumstances, a reasonable factfinder could not find

that the county had control over Compton's working environment and conditions. *Cf. id.* at 966 (reasonable factfinder could find that county department had "control" over plaintiff's "work and employment" where county "assigned" plaintiff specific projects, "dictated the order in which he was to complete them," and parties disputed whether county set plaintiff's hours); *Reyes*, 495 F.3d at 408 (finding defendant was a joint employer where it posted supervisors in the field and inspected the plaintiffs' work, creating "a single operation under 'common control'" (quoting 29 U.S.C. § 203(s)).

The county relies on the *Lauritzen* factors. They are an awkward fit for the facts of this case, but their application leads to the same result. For the reasons just discussed, the first factor—control—favors the county. The second factor, Compton's opportunity for profit or loss depending upon her managerial skill, doesn't apply. The third factor, Compton's investment in equipment or materials required for the task, also weighs in favor of the county. The county did not provide her with any equipment or supplies, and Compton bought books for the client without seeking reimbursement. Compton argues that the county overemphasizes the importance of a few books. I agree with Compton that purchasing relatively inexpensive books for the client is not a significant investment. But it does serve as an example of Compton going about her work on a largely independent basis, rather than receiving supplies from the county.

The fourth factor, whether the service rendered requires a special skill, also doesn't apply here. As to the fifth factor, the duration and permanency of the working relationship, the record is unclear about whether Compton's work was permanent or temporary. A client could request a different respite worker, and the county ended its

13

participation in the program. These facts suggest the work was not guaranteed or permanent. But Compton worked with Gaydos for at least two years and continued working after he retired. That the duration of the work spanned multiple years cuts in Compton's favor.

Finally, the sixth factor is the extent to which the service was an integral part of the alleged employer's business. This factor cuts against Compton. Compton argues that her work was integral to the business of the county health department because she was ensuring the health of her client. But to the extent Compton's work was integral, it was integral to the client himself. The county had a small role in facilitating the home-based program for the state, and there is no evidence that the program was a significant part of what the health department did. Indeed, that the county did not contribute financially to the program at all, and ended it when the state stopped funding it, suggests that the county did not consider it particularly important. On balance, the *Lauritzen* factors support the county's argument that it did not employ Compton. The amount of control over Compton's work is the most fitting factor, and that factor favors the county.

Compton argues that the county was her employer because the county recruited her, hired her, set her rate of pay, assigned her a client, supervised her, and had the authority to fire her. [51] at 7–8. The record belies most of those characterizations, and the ones that survive are insufficient to show that the county exerted control over Compton's working conditions. Beginning with Compton's assertion that the county was her employer because it "recruited" her, the record does

14

not support that claim. In fact, both Compton and Gaydos testified that a mutual acquaintance told Gaydos that Compton was seeking work, and Gaydos then sat down with Compton and told her that the state was hiring respite workers. [52-3] 28:6–12; [55-4] 12:22–13:7. Gaydos merely conveyed information to Compton about open positions; that is not the same as recruiting her. Nor did Gaydos "hire" her. Gaydos helped her fill out an application that was sent to the state. It was the state who decided whether or not to accept Compton as a respite worker based on her application and a background check. If Compton was "hired" by anyone, it was the state. While Compton's perception might have been that Gaydos hired her because he was the one who told her about the positions and helped her fill out the application, Gaydos was only a conduit between Compton and the state.

Compton asserts that the county had the power to fire her, while the county claims that only the client could fire her. Gaydos testified that, if the client and assigned worker were not getting along, the client could ask for another respite worker, and Gaydos would assign someone else. [52-3] 21:18–20. Compton and the county draw competing inferences from this statement, but Gaydos did not testify that either the county or the client could terminate Compton's employment. The reasonable inference from Gaydos's testimony is that if a client became unsatisfied with his respite worker, Gaydos would rematch *both* the client and the respite worker. The evidence does not support Compton's assertion that the county could fire her.

Compton also contends that the county set her rate of pay. Gaydos testified that the state set the rate of pay for the respite workers. [55-3] 26:24–27:5. Compton

15

cites to her own testimony that Gaydos set her rate at $20 an hour. [55-4] 14:10–22. But after Compton said that, she immediately backtracked and said that all the respite workers were paid $20 an hour. [55-4] 14:10–22. And Compton would have had no personal knowledge of who set the rate. There is no genuine dispute that it was the state who set her hourly rate.

Compton also argues that the county was her employer because it "supervised" her work, directed her to contact the county if she had questions, and provided a new supervisor once Gaydos retired. The county does not dispute that it designated a point person to oversee the program, answer questions from the respite workers, report hours worked to the state, and occasionally check in to make sure things were running smoothly. Nor does the county dispute that someone replaced Gaydos when he retired. But such high-level and infrequent oversight did not rise to the level of control required to show that the county employed her.

Compton's attempt to analogize the county's level of oversight to that of a typical employer who supervises from a distance is unpersuasive. [64] at 9. The county need not have micromanaged every decision Compton made to be considered her employer under FLSA. But a reasonable factfinder would expect even the most hands-off employer to set some rough guidelines for how many hours to work and when, to provide employees guidance on what tasks to complete, or to communicate with employees more than once a month to collect hours or check in at a high level of generality. Compton's evidence of oversight does not raise a material dispute over the

16

amount of control the county had over Compton's work, because even with that evidence, no factfinder could reasonably conclude that the county was her employer.[9]

**D.    The State-Law Claims**

In her amended complaint, Compton brings a claim under the Illinois Minimum Wage Law and a breach-of-contract claim. [23] at 8–10. The county asks me to relinquish jurisdiction over those claims or grant summary judgment on them for the county. The IMWL uses a similar definition of "employee" as the FLSA. *See* 820 Ill. Comp. Stat. Ann. 105/3 § 3(d) ("'Employee' includes any individual permitted to work by an employer in an occupation."). The Illinois Administrative Code, as under the FLSA, defines employee as any individual "permitted or suffered to work" by an employer. Ill. Admin. Code tit. 56 § 210.110. The code also provides six factors that inform whether someone has been permitted or suffered to work by an alleged employer; those factors track the *Lauritzen* test. *Id.* Thus, because the IMWL "parallels the FLSA so closely," courts have "generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both." *Callahan v. City of Chicago*, 78 F.Supp.3d 791, 821 (N.D. Ill. 2015), *aff'd*, 813 F.3d 658 (7th Cir. 2016); *see also Deschepper v. Midwest Wine and Spirits, Inc.*, 84 F.Supp.3d 767, 778 (N.D. Ill. 2015) (where plaintiffs' "IMWL claim track[ed] their FLSA claim," the "FLSA analysis applie[d] equally to the plaintiffs' IMWL claim"); *Villareal v. El Chile,*

---

[9] Compton raises an irrelevant argument that she was not a volunteer. [51] at 11–12. But volunteerism is not a necessary consequence of a finding that the county was not her employer; it is a non sequitur. Compton seeks a judicial finding that the county knew about her work hours. [51] at 12–13. There is no dispute that the county knew about her hours, but that knowledge does not evince any control over her employment.

*Inc.*, 776 F.Supp.2d 778, 784 (N.D. Ill. 2011) ("[T]he IMWL parallels the FLSA, and the same analysis generally applies to both statutes."). The county did not employ Compton as a matter of law under the FLSA and this determination applies to the IMWL claim as well. The county's motion for summary judgment on Count II is granted.

Resolution of the breach-of-contract claim would require application of state law, so I relinquish jurisdiction over the breach-of-contract claim and dismiss it without prejudice. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when 'all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.'" (quoting *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994))).

## IV. Conclusion

The county's motion for summary judgment on Counts I and II, [53], is granted. The county's motion to strike is denied. Compton's motion for partial summary judgment, [50], is denied. Count III is dismissed without prejudice. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: December 12, 2019